EARL J. CAIN,

      Plaintiff,

      v.

ILLINOIS CENTRAL RAILROAD, PHILIP
YOURICH, BRIAN TRACY, KEVIN
GEBHARDT, and JAMES DANIELWICZ,

      Defendants.

No. 15 CV 8324

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Plaintiff Earl Cain worked as an electrician for defendant Illinois Central Railroad. After receiving a letter of caution in 2012 that he felt was unfair, Cain filed a complaint with the EEOC. Two years later, Illinois Central fired Cain for sleeping on the job. Cain brought this action against Illinois Central and his former supervisors alleging both race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981. Defendants move for summary judgment. For the following reasons, defendants' motions are granted.

## I.    Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether a genuine issue of material fact exists, the court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *See King v. Ford Motor Co.*, 872 F.3d 833, 837 (7th Cir. 2017).

## II.  **Background**

Cain worked for Illinois Central, a rail carrier, as an electrician in their mechanical maintenance department. [62] ¶¶ 1, 3, 5.[1] Prior to his employment at Illinois Central, Cain worked as an electrician with the Elgin, Joliet and Eastern Railway. *Id*. ¶ 4. Cain started working with the Elgin, Joliet and Eastern Railway in November 1997, and Illinois Central purchased the railway around 2009. *Id*. As an electrician, Cain tested locomotives and performed inspections, repairs, and electrical work. *Id*. ¶ 5.

Cain was a unionized employee and subject to a collective bargaining agreement, and discipline was administered through the due process provisions of that agreement. *Id*. ¶ 6. Pursuant to the agreement, Illinois Central would conduct an investigative hearing before assessing discipline. *Id*. ¶ 7. A hearing officer

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from plaintiff's response to defendants' LR 56.1 statement of facts, [62], and defendants' response to plaintiff's LR 56.1 statement of additional facts, [68], where the asserted fact and accompanying response are set forth in the same document. Danielwicz did not respond to plaintiff's statement of additional facts, but I read his reply brief to assert that he joined in the other defendants' responses.

conducted the hearing and a court reporter transcribed it. *Id.* ¶ 8. Based on the facts elicited during the hearing, Illinois Central decided whether the employee had violated a company rule, and if so, the appropriate level of discipline. *Id.* Alternatively, an employee could request to waive an investigative hearing by accepting responsibility and receive discipline at a manager's discretion. *Id.* ¶ 7. The Illinois Central decisionmaker had discretion in assigning a penalty and generally considered the severity of the offense, whether the employee had accepted a waiver, and the employee's disciplinary history. *See* [62-4] 93:6–95:10. Coaching and letters of caution were not disciplinary events and so not subject to the same process. [62] ¶ 6.

At the relevant time, Cain reported to Kevin Gebhardt, the Manager of the Woodcrest Shop. *Id.* ¶ 3. Gebhardt, in turn, reported to Philip Yourich, Assistant Chief-Mechanical. *Id.* Brian Tracy, Assistant Mechanical Manager, also reported to Yourich. *Id.* Yourich reported to James Danielwicz, Vice President of the Mechanical Department, who oversaw 3,500 employees throughout the United States. *Id.*; [68] ¶ 2. Danielwicz was the ultimate authority in the disciplinary process, and he reviewed all discipline resulting in time off or discharge. [68] ¶ 3.

Cain was disciplined for various conduct throughout his employment at both railroads. During his time at the Elgin, Joliet and Eastern Railway, he had a poor attendance record, received demerits for negligence on the job and safety violations, and was dismissed for fabricating a safety observation—though he was reinstated a year later. [62] ¶ 9, 16–18, 21–23.

At Illinois Central, Cain received two "needs development" performance reviews. *Id*. ¶¶ 10, 14. Illinois Central conducted a formal investigation hearing to determine whether Cain had violated any rules when he failed to promptly report to his supervisor after returning from an offsite road call and was observed sitting in a company truck for twenty minutes in the parking lot. *Id*. ¶ 15. Cain did not receive any discipline based on this incident. *Id*. He also received a letter of reprimand after admitting to using a personal cell phone during work hours, in violation of Illinois Central policy, and Illinois Central conducted an investigation of his suspected abuse of FMLA leave, though Cain was not disciplined based on the investigation. *Id*. ¶ 24. Cain received two letters of caution, one saying he had failed to be at his assigned work station (though Cain says this was not true) and another for failing to wear a helmet (conduct Cain admits to). *Id*. ¶¶ 12–13. In November 2012, Cain filed an EEOC charge, claiming that the letter of caution he had received for failing to be at his work station was unfair. *Id*. ¶ 25; [44-1] at 86:3–18. His charge named two supervisors who are not parties to this lawsuit. [62] ¶ 25.

On November 8, 2014, Cain was supposed to inspecting a locomotive. *Id*. ¶ 30. Dick Adreon, Cain's supervisor who provided him with day-to-day directions, says he walked by the locomotive Cain was supposed to be inspecting and saw him reclining in the back of a cab. *Id*. ¶¶ 30, 32. Adreon called Gebhardt, the shop manager, and told him he had seen Cain reclined in the cab with his head back, sleeping. *Id*. ¶ 33. Adreon then walked from the tracks to the foreman's office, a 15–20 minute walk, to meet Gebhardt, and the two of them walked back to the

locomotive. *Id.* ¶ 34. Adreon stopped at the front corner of the locomotive while Gebhardt looked in the side window. *Id.* ¶ 35.[2]

The parties dispute whether Adreon and Gebhardt were able to see through the locomotive's tinted windows. Cain says that because the side windows are so tinted it is impossible to see inside, and because the cab is too high off the ground to see in through the front window, Adreon and Gebhardt could not see into the locomotive at all, and testimony to the contrary is false. *See* ¶ 32; [62-2] at 7. Defendants do not dispute that the side windows are tinted so that one cannot make out fine details, but they say the side windows are not completely opaque and that the front and rear windows are not tinted. *Id.* ¶ 35. Adreon said he could not see inside the locomotive very well, but both Adreon and Gebhardt said they could see enough to tell that Cain had remained in the same position and was not moving. [62] ¶¶ 34–35; [62-5] at 12:1–7. The parties further dispute whether Cain had just one foot up or two and whether his head was slumped back. [62] ¶ 32. Cain claims he was awake, sitting in one of the seats with his right foot up to tie his shoe while he worked on the locomotive's radio. *Id.* ¶ 31. The parties agree Gebhardt then walked around to the back door of the cab and opened it. *Id.* ¶ 36. But they disagree about whether Cain jumped up in response—Cain says he saw the supervisors approaching and opened the window to talk to them. *Id.*; [68] ¶ 6. Cain asked what they needed and Gebhardt responded, "[y]ou were sleeping. We're going to have an investigation." [62] ¶ 36. Cain denied that he had been sleeping. *Id.* Viewing these

---

[2] This statement of fact is missing a paragraph number, but appears directly after ¶ 35 in [62].

facts in the light most favorable to Cain, Adreon and Gebhardt were unable to see inside the locomotive and did not know whether Cain was asleep, but accused him of sleeping anyway.

Sleeping on the job is a violation of Illinois Central rules. *Id*. ¶ 38. Rule 20 of the Mechanical/Material Department Employees General Regulations provides that "[e]mployees must not sleep while on duty. Employees slouched or reclined with their eyes closed or concealed will be in violation of this rule." [62-7] at 2. Rule 20 also prohibits engaging in other recreational activities while working, such as reading, playing games, and using electronic devices. *Id*. Cain received a copy of the rules during his employment. [62] ¶ 39. Illinois Central managers interpret the rule to apply when an employee is in slouched position and not working. *Id*. ¶ 40.

After his encounter with Cain, Gebhardt determined that Illinois Central should hold a formal hearing to investigate the incident, and Cain received a notice of the investigation, which was scheduled to occur on November 20, 2014. *Id*. ¶¶ 43– 44. Cain did not request a hearing waiver. *Id*. ¶ 45. Only Adreon testified against Cain at the hearing. [68] ¶ 8. Adreon testified, "[a]s we w[ere] walking up towards the engine you could see Mr. Cain's feet in the window propped up on the cab heater and there was no movement. We looked in the window. The windows were tinted so you couldn't really see him in there real well." [62-5] at 11:21–12:3. Adreon said he was not able to see Cain's eyes. *Id*. at 27:3–6. Gebhardt did not testify at the hearing, even though it took place a few feet from his office. [68] ¶ 7. Gebhardt said he did not know whether Cain was sleeping, he just knew he was in a reclined

position with his feet propped up. [62-6] at 48:15–23, 64:13–24. Cain was present for the investigative hearing, represented by his union, and able to ask all the questions he wanted. [62] ¶¶ 45–46. He believes the investigation was fair and impartial. *Id*. ¶ 46. During the investigation, Cain stated that he believed that Gebhardt was targeting him because he had made a complaint on a safety hotline two weeks earlier. *Id*. ¶ 52.

After the investigation, Yourich read the transcript and concluded that Cain had violated Rule 20. *Id*. ¶ 47. In determining the appropriate discipline, Yourich considered Cain's disciplinary history, which he learned about from a Labor Relations employee who helped obtain and summarize Cain's disciplinary record and from a conversation with Gebhardt. *Id*. ¶ 48; [62-4] at 30:11–20. When asked whether Yourich ever asked for his opinion as to Cain's work history, Gebhardt gave contradictory responses. *See* [62-6] at 86:14–18, 87:20–23. Gebhardt also said he did not make a recommendation as to whether Cain should have been discharged. *Id*. at 86:19–21. Yourich, however, stated that he relied on Gebhardt's opinion that Cain should be discharged when deciding Cain's punishment. [62-4] at 84:17–85:2.

Yourich also considered records from Cain's previous employer. *Id*. at 28:8–30:10. In explaining Illinois Central's disciplinary procedure, Danielwicz stated that if a company, like the Elgin, Joliet and Eastern Railway, used a demerit system—whereby demerits dropped off an employee's record after a certain period of time—those demerits should not be considered in assigning subsequent discipline. [62-3] at 54:9–21. In a demerit system, the incidents of misconduct would remain on the

employee's file even though the demerits themselves were expunged. *Id*. at 63:12–64:10. Illinois Central, unlike Elgin, Joliet and Eastern Railway, did not use a demerits-based system. *See id*. at 54:9–16.

Based on Cain's employment record as a whole, including his overall work performance, his disciplinary history (including misconduct that did not result in formal discipline), Adreon and Gebhardt's reports, and the seriousness of the violation, Yourich determined that Cain should be dismissed. [62] ¶ 47; [62-4] at 27:2–31:18. Yourich consulted Danielwicz, who reviewed Cain's disciplinary record and the hearing transcript before approving the decision. [62] ¶ 49. Brian Tracy delivered a letter to Cain stating that his employment was terminated. *Id*. ¶ 51. Cain complained to Human Resources that his termination was unfair and motivated by his race. *Id*. ¶ 53. He also filed a union grievance, and the Public Law Board upheld the termination, noting that sleeping on the job had long been a serious offense and that Cain had a poor disciplinary record. *Id*. ¶ 54.

Other Illinois Central employees have been disciplined for violating Rule 20. Tim and Jonathan Diaz, two Hispanic employees, were caught sleeping, admitted to their violations, and waived their investigative hearings. *Id*. ¶ 58–59. Jonathan Diaz received a 60-day actual suspension and a 30-day deferred suspension (meaning he would serve another 30 days if he committed additional misconduct or policy violations in the next year). *Id*. ¶ 59. Tim Diaz received a 30-day actual suspension and a 30-day deferred suspension. *Id*. Neither Diaz brother had any prior discipline on his record. *Id*. Other employees, including at least three white

employees, were terminated for violating Rule 20 between 2013 and 2014. *Id*. ¶ 60. Warren Winker, a white employee who Danielwicz referred to as a "constant rule violator," was caught by a manager not a party to this action for sleeping in the 1970s and was not fired. [68] ¶ 32; [62-8] at 53:5–20. Winker also remembers seeing one black and one white employee sleeping, but is unsure whether either ever got caught. [62-8] at 55:10–24, 73:6–23.[3] Some black employees who violated Rule 20 received discipline short of dismissal. Christopher Dean was observed sitting in a cab in violation of the rule and received a nondisciplinary letter of caution. [62] ¶ 61. In 2015, Ebony Woods put her head down in a women's locker room and another employee who saw her concluded she was sleeping, left, and returned to the locker room with Tracy, who told Woods she could not sleep at work. *Id*. ¶ 62. Woods received a nondisciplinary letter of caution. *Id*.

Cain asserts that Illinois Central disciplined black employees more harshly than white employees for comparable and less serious violations. George Groll, a white employee, side-swiped a locomotive. *Id*. ¶ 64; [68] ¶ 28. Groll admitted responsibility, waived investigation and accepted a 30-day suspension, and had no prior history of discipline. *Id*. In another incident, while driving a company car and talking on his cell phone, Groll hit another employee's car. *Id*. This incident does not appear on Groll's file. *Id*. Gebhardt brought a heath shield—a component of a weapon—onto Illinois Central premises after his work shift had ended. [62] ¶ 66. A

---

[3] Cain asserts that, according to Winker, a black employee was fired for sleeping on the job in the 1990s. *See* [68] ¶ 32. However, the record shows that Winker's only knowledge of this incident was from "word of mouth," so this statement is impermissible hearsay. [62-8] at 50:2–22.

white electrician who worked in the same facility as Cain miswired a generator causing losses of thousands of dollars and was not discharged. [68] ¶ 26. Another white electrician supervisor who also worked in the same facility falsified a federal document and was discharged but later brought back to work. *Id*. ¶ 27.

Dean, who is black, was a laborer for Illinois Central before being terminated for exceeding three absences in ninety days. [62] ¶ 68; [62-10] at 44:3–8. One of those absences was for the Fourth of July. [62] ¶ 68. Dean found another employee to cover his shift, but failed to get prior approval by a manager. *Id*. The parties dispute whether manager approval was required. *Id*. Another one of his absences was from a day he missed work due to a winter storm. [62-10] at 44:11–45:4. Dean says that white employees who missed work that day were given an excused absence. *Id*. Jeff Brown, who is black, worked as a sheet metal technician and was discharged for threatening a supervisor, though Cain asserts that the statements were not actually threatening. [62] ¶ 73.

Woods, who is black, was terminated because she failed to wear proper eye safety equipment while driving a forklift—she was wearing glasses but not side shields, which are also required. *Id*. ¶ 69. Woods was rehired and again violated Illinois Central rules by driving a forklift into an office window. *Id*. ¶ 71. She admitted to that violation, waived an investigation, and received a 30-day actual suspension. *Id*. Yourich observed Winker violating the protective eyewear rule on at least two occasions. [68] ¶ 31. The first time Yourich gave Winker a verbal warning

because Winker had a clean record,[4] and the second time Yourich caught him, Winker received a 30-day suspension because it was the third incident on his record (he had been disciplined another time in the interim). [62-4] at 131:9–138:10; [62] ¶ 65. Yourich, Tracey, Gebhardt, and Danielwicz have all failed to wear proper eyewear at times. [68] ¶ 34.

A white employee under Yourich and Danielwicz's supervision hung a noose in an Illinois Central facility in Memphis. [62-4] at 119:2–121:2. Yourich recommended dismissal, but Danielwicz overruled him. *Id*. at 120:19–121:2. During his career at Illinois Central, Winker heard racist comments, including use of hateful epithets. [68] ¶ 35. Winker also heard Tracy say that a new Jewel grocery store might bring blacks into the neighborhood. *Id*. Dean heard racist comments at Illinois Central, as well. *Id*. ¶ 36.[5] No one at Illinois Central ever said anything racially discriminatory or harassing to Cain. [44-1] at 99:7–10.

Cain, who served as a union steward, observed that white electricians received more favorable and complex job assignments than black electricians,

---

[4] There is no evidence that Yourich was aware that Winker had been caught sleeping in the 1970s or of any other undocumented rule violations.

[5] Cain asserts that an engineer who worked for Illinois Central in a different location and department was terminated in 2012 because of his race. [62] ¶ 74. Cain's only knowledge about this incident is from reading about allegations against Illinois Central in the news and on the internet. *Id*. Cain also asserts that in 2009, the Elgin, Joliet and Eastern Railway settled a lawsuit dealing with racial discrimination. *Id*. ¶ 75. Cain knew of one worker who was part of the lawsuit, but otherwise does not know any details of the lawsuit and does not know if it involved allegations against Yourich, Tracy, or Gebhardt. *Id*. Cain has no personal knowledge about these incidents and so his assertions based on them are inadmissible.

meaning black electricians had fewer opportunities to develop their skills and receive overtime. [68] ¶¶ 19–21.[6] Winker also asserted that black employees received more repetitive and burdensome work than white employees. [62-8] at 129:2–23. As an example, Winker pointed to Tom Fitzgerald, a white electrician who received most troubleshooting assignments, though Winker said it was possible Fitzgerald got those assignments because he was the best electrician. *Id*. at 129:24–130:23. Woods agreed that black employees did not have the same opportunities to advance as white employees and said that they were held to a higher standard. [62-9] at 77:5–21.

Cain filed a complaint with the EEOC on December 11, 2014, alleging that his discharge from Illinois Central was retaliation against him for his 2012 EEOC complaint and that Illinois Central had discriminated against him based on his race. [62] ¶ 76. At the time he approved Cain's discharge, Danielwicz was not aware of Cain's 2012 EEOC charge. [57] ¶ 77. The EEOC dismissed the 2014 charge on July 22, 2015. [62] ¶ 76.

## III.  Analysis

Cain alleges that defendants fired him because of his race and as retaliation for submitting a complaint to the EEOC in violation of Title VII and § 1981. Defendants argue no reasonable jury could find for Cain on either claim.

---

[6] Defendants argue that plaintiff's declaration, where he articulates these observations, is self-serving, contradictory, and should be stricken. While self-serving affidavits without factual support are insufficient to defeat a motion for summary judgment, *see Palmer v. Marion Cnty.*, 327 F.3d 588, 596 (7th Cir. 2003), Cain's declaration contains factual assertions, many of which are based on his personal knowledge. Striking the declaration as a whole is inappropriate.

## A.    Race Discrimination

To prevail, a plaintiff alleging race-based employment discrimination must present evidence that, as a whole, allows a reasonable factfinder to conclude that the plaintiff's race caused the adverse employment action. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Evidence should not be treated differently based on whether it is direct or indirect. *Id.* A court should assess all evidence cumulatively to determine whether a reasonable factfinder could find that the adverse act was caused by the plaintiff's protected characteristic. *See David v. Bd. of Trustees of Comm. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). Because defendants presented their arguments using the *McDonnell Douglas* burden-shifting framework—which is a "means of organizing, presenting, and assessing circumstantial evidence"—I begin by reviewing the evidence in those terms. *Id.*

### 1.    *McDonnell Douglas*

Under the *McDonnell Douglas* burden-shifting analysis, a plaintiff must first establish a prima facie case of discrimination by demonstrating that (1) he is a member of a protected class; (2) he was meeting the defendant's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated individuals outside of the protected class. *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012). If the plaintiff establishes a prima facie case, then the burden shifts to the defendants to provide a legitimate justification for the adverse action. *Id.* If the defendants provide a nondiscriminatory justification, then the burden shifts back to the

plaintiff to show that the defendants' justification is pretextual. *Id*. Defendants argue that Cain has failed to establish a prima facie case because he has not shown that he was meeting defendants' legitimate expectations or that he was treated less favorably than similarly situated individuals.

Cain provides no support for either the contention that he was meeting defendants' expectations, or that those expectations were illegitimate. The record is clear that Cain had a long history of misconduct and discipline dating back to his time at the Elgin, Joliet and Eastern Railway. Cain admits he received negative performance reviews, letters of caution, and a letter of reprimand. He suggests that it was improper or suspicious for Illinois Central to rely on instances of misconduct that did not result in formal discipline or for which the corresponding demerits had been expunged, but provides no justifications for these propositions. As support, Cain relies solely on Danielwicz's comment that in a demerits-based disciplinary system it would be inappropriate to rely on demerits that had been wiped from an employee's record. The *demerits* Cain had received from his previous employer were no longer on his record, but nothing prohibited Yourich from considering the underlying misconduct associated with those demerits, which remained on Cain's record, when determining Cain's discipline. Cain points to no examples of other employees whose similar backgrounds were not considered which would allow a jury to infer that relying on these incidents was improper. And further, defendants provide ample other examples where Cain's behavior at Illinois Central failed to meet legitimate expectations, and Cain provides no evidence to dispute these

assertions, nor does he argue that those expectations were illegitimate. Based on the evidence in the record, Cain cannot show he met Illinois Central's legitimate expectations.

Cain also fails to provide examples of similarly situated nonblack individuals who were treated more favorably. The comparator must be similarly situated in all material respects. *Greer v. Bd. of Educ. of City of Chicago*, 267 F.3d 723, 728 (7th Cir. 2001). "In the usual case a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) (internal quotation marks omitted).

As comparators, Cain points to nonblack employees who were caught sleeping and not discharged, including the Diaz brothers, Winker, and another white employee who Winker says he saw sleeping. None of these employees is sufficiently similar to Cain to serve as a comparator. Cain does not provide any information about who supervised the Diaz brothers (aside from Danielwicz, who serves as the ultimate authority on discipline for all employees). Nor does Cain assert whether the brothers were subject to the same standards as he was. Even assuming the same decisionmakers disciplined Cain and the Diaz brothers and that they were subject to the same standards, neither brother had any prior discipline on his record (and Cain points to no prior misconduct that was missing from their records, but should have been considered) and both admitted to their violations and waived their

hearings, which justifies their less severe punishments. Winker dealt with a different supervisor, many years prior, and it is unclear whether Rule 20 was in place at the time. There is no evidence that the other employee Winker saw sleeping was ever caught, which disqualifies him as a potential comparator. As further support for their argument that Cain has failed to establish a prima facie case, defendants point out that some black employees who violated Rule 20 were not terminated, and some nonblack employees who violated Rule 20 were terminated. Based on this evidence, the similarly situated requirement has not been met and Cain has failed to establish a prima facie case which would allow him to defeat summary judgment using the *McDonnell Douglas* framework.

### 2. *Cumulative Review*

Cain argues that a jury could conclude that race was the reason for his termination because Illinois Central treats black employees worse than nonblack employees, he was falsely accused of being asleep, and his prior misconduct should not have been considered.

Cain provides evidence of past behavior and comments of Illinois Central employees, which can be used to demonstrate animus when attributed to someone who provided input into the adverse employment decision. *Hasan v. Foley & Lardner, LLP*, 552 F.3d 520, 528–29 (7th Cir. 2008) ("The recency of discriminatory comments, together with who made the comments and how extreme those comments were, is relevant to whether they help to build a total picture of discrimination."); *see also Taylor v. Village of Dolton, Illinois*, No. 17-1097, 2017 WL

6311687 (7th Cir. Dec. 11, 2017) (unpublished and non-precedential). Against that backdrop of racial inequality, Cain argues that the suspicious circumstances surrounding his own termination—that there is no evidence that he violated Rule 20, that defendants inappropriately relied on his disciplinary history that had been expunged, and that the individual defendants offered shifting and contradictory explanations about their decisionmaking—are sufficient evidence to allow a reasonable factfinder to determine that his termination was based on his race. But considering the evidence as a whole, no reasonable jury could find in Cain's favor.

Cain attempts to demonstrate a culture of inequality at Illinois Central by alleging that black employees were disciplined more harshly and given fewer opportunities to advance than nonblack employees. The evidence he produces to show that black employees were punished more harshly for equal or less serious violations, however, is insufficient. As discussed above, the examples of Rule 20 violations Cain relies on lack important details and fail to demonstrate that any unequal treatment was not justified. The other examples of unequal discipline he puts forth are similarly insufficient. Cain generally asserts that Illinois Central treated white employees favorably by excusing their absences and letting them off the hook for severe rule violations, such as getting into a car accident in a company vehicle and falsifying a federal document. But Cain fails to identify the relevant supervisors involved in these incidents that could link this conduct to his own treatment. And without evidence that black employees were treated differently in *similar* situations, these incidents do not substantiate Cain's claim that employees

were punished differently based on their race. Aside from discipline, Cain also alleges that white employees received more complicated and favorable assignments than black employees, relying on his own observations, along with those of Woods and Winker. Other than general assertions, however, Cain offers no example where a qualified black employee was overlooked for an assignment in favor of a less-qualified nonblack employee.

Cain then argues that, in light of the racial animus allegedly in place at Illinois Central, the suspicious circumstances of his violation are enough to allow a jury to find that defendants' proffered justifications were pretextual and that his race was the real cause of his termination. To establish that an employer's proffered justifications for an adverse action are pretextual, an employee must put "forth evidence suggesting that the employer itself did not believe the proffered reasons for termination." *Burks v. Wisconsin Dept. of Transp.*, 464 F.3d 744, 754 (7th Cir. 2006). Whether the employer's actions were mistaken or foolish is not at issue as long as the employer honestly believed those reasons. *Id.* Viewing the facts in the light most favorable to Cain, Adreon and Gebhardt were unable to see inside the locomotive.[7] But though it may have been ill considered to conclude that Cain was sleeping under these circumstances, there is no evidence that the key

---

[7] Cain asserts that Danielwicz has admitted that a supervisor must see an employee's eyes to determine that he is sleeping. [68] ¶ 11. In the cited testimony, Danielwicz agrees it is a fair statement that "[a]n employee is considered to be sleeping if they're—they have to have two things, right, slouched or reclined, and their eyes closed or concealed?" [62-3] at 74:3–13. He does not say that a supervisor must see an employee's eyes closed to conclude that the employee is sleeping.

decisionmakers—Yourich and Danielwicz, who relied on Adreon's testimony—did not genuinely believe that Cain was asleep. As discussed above, Cain has provided insufficient evidence that black employees in general were treated less favorably than nonblack employees that could be imputed onto the decisionmakers responsible for Cain's punishment. Without more, even assuming that Adreon and Gebhardt lied about seeing Cain reclined inside the locomotive, there is no indication that they lied because of Cain's race. Cain has not shown that either Adreon or Gebhardt used racial epithets or treated black employees unfairly in the past, which combined with these somewhat suspicious circumstances may have been sufficient to allow a reasonable jury to find in Cain's favor.[8] Like Adreon and Gebhardt, there is no evidence that Yourich harbored any racial animus. Cain does present evidence that suggests Danielwicz's racial animus—his lax punishment of an employee who hung a noose at work—but because Cain identifies no animus on behalf of Adreon, Gebhardt, or Yourich, and because Danielwicz merely affirmed their findings and recommendation, the anecdote suggesting Danielwicz's racial animus, which was not directed at Cain, is insufficient to show that the decisionmakers terminated Cain because of his race.

That Yourich and Gebhardt offered inconsistent accounts of the decisionmaking process and considered demerits that had been expunged from Cain's record and misconduct that had not resulted in discipline—even when

---

[8] Cain's assertions that Tracy and other unnamed employees made racist comments in the past are irrelevant because there is no evidence that these individuals provided input into the decision to fire Cain. *See Hasan*, 552 F.3d at 528.

considered in conjunction with the evidence discussed above—is insufficient to allow a reasonable jury to find in Cain's favor. Shifting and inconsistent explanations create a reasonable inference that a justification is pretextual. *Hitchcock v. Angel Corps., Inc.*, 718 F.3d 733, 738 (7th Cir. 2013). But here, the supervisors' accounts are consistent and neither changed his story over time. They disagree about whether Gebhardt agreed termination was the proper punishment, but this discrepancy is not an inconsistency about the actual decision and its basis—Cain's sleeping. Cain's arguments that defendants inappropriately relied on demerits he received from his previous employer and for misconduct for which he was not disciplined similarly fall short of demonstrating pretext. As discussed, Cain provides no evidence that relying on either of these pieces of information was out of the ordinary and no examples where Illinois Central supervisors disciplined nonblack employees without considering similar information.

In sum, without evidence that the decisionmakers responsible for Cain's termination harbored any racial animus, the evidence surrounding Cain's termination is insufficient to show that any of the individual defendants accused him, decided to terminate him, or approved that decision because of his race. Cain's evidence of other instances of inequality is not linked to the individual defendants and fails to demonstrate a pervasively hostile workplace which would allow a reasonable factfinder to conclude that the decisionmakers in Cain's situation acted out of racial animus.

### 3. *Individual liability*

The same standard applies to discrimination and retaliation claims under § 1981 and Title VII. *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017). Section 1981—unlike Title VII, which authorizes suits against only the employer as an entity—authorizes individual liability when the "individual defendants caused or participated" in the adverse employment action. *Smith v. Bray*, 681 F.3d 888, 897–899 (7th Cir. 2012) (*overruled on other grounds by Ortiz*, 834 F.3d at 764). In the § 1983 context—which uses an analogous standard, *see id.*,—a defendant personally participated if the relevant conduct "occur[red] at [his] direction or with [his] knowledge and consent." *Hildebrandt v. Illinois Dept. of Nat. Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003) (*quoting Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). To recover against an individual, a plaintiff must also prove that the individual defendant acted because of the plaintiff's race. *Smith*, 681 F.3d at 899–902. In other words, in addition to proving that he was fired because of his race, to prevail against the individual defendants Cain must demonstrate that each caused or participated in his termination and that Cain's race was a "substantial or motivating factor" in that individual's decision to terminate Cain. *See id.* at 900.

Cain does not directly address defendants' argument that he failed to identify individual bases of liability. The record, however, illustrates each defendant's role in Cain's termination. Gebhardt observed the conduct that served as the grounds for Cain's dismissal, contributed information about Cain's disciplinary history to the investigation, failed to testify at the hearing, and gave his opinion that Cain should

be fired (according to Yourich). Yourich recommended that Cain be terminated based on the outcome of the hearing, Cain's disciplinary history, and his past work performance. Danielwicz approved Yourich's recommendation, and Tracy delivered the letter.

Though there is some evidence of Tracy's racial animus (the comment about a Jewel bringing black people into the neighborhood), there is no evidence suggesting that Tracy participated in the decision to terminate Cain. Yourich and Gebhardt participated in the decision and both arguably caused Cain's termination, but there is no evidence that either harbored any racial animus that would allow a reasonable jury to find that Cain's race motivated their decisions. Danielwicz reviewed the hearing transcript and Cain's record and approved the decision, but the only evidence of Danielwicz's racial animus is that in a separate incident he overruled a recommendation of termination for an employee who hung a noose in a different facility. While that incident is relevant, as discussed above, it is not enough to reasonably conclude that Danielwicz's approval of Yourich's recommendation was motivated by Cain's race as opposed to a genuine belief that Cain had broken a rule that warranted his termination in light of his history of discipline. Cain has failed to establish that any of the individual defendants acted with the requisite intent to be liable under § 1981.

## B. Retaliation

To survive summary judgment on his retaliation claim, Cain must offer evidence of "(1) a statutorily protected activity; (2) a materially adverse action taken

by the employer; and (3) a causal connection between the two." *Baines*, 863 F.3d at 661 (*quoting Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403–04 (7th Cir. 2007)). Defendants argue that Cain has failed to demonstrate a causal connection between his 2012 EEOC complaint and his termination two years later. A causal connection exists if the defendant would not have taken the adverse action but for the plaintiff's protected activity. *Id*. A two-year gap is too long to establish a connection based on temporal proximity. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006) ("[A] temporal connection of four months fail[s] to establish a causal connection between a protected activity and an adverse action."). Nor has Cain shown that any of the decisionmakers responsible for his termination were aware of his 2012 EEOC complaint, which did not name any of the individual defendants. Cain does not address the defendants' argument that he has failed to establish a causal connection between his protected activity and the alleged retaliation and so has waived any argument in response. *See Nichols v. Michigan City Plant Planning Dept.*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment."). Cain has failed to demonstrate a causal connection between his protected activity and his termination.

Because no reasonable jury could conclude that Cain's termination was based either on his race or on his prior protected activity, defendants' motions for summary judgment are granted.

# IV.    Conclusion

Defendants' motions for summary judgment [41] and [49] are granted. Enter judgment and terminate civil case.

ENTER:

Manish S. Shah
United States District Judge

Date:  March 2, 2018